**Kim RENNIE, Plaintiff,**

v.

**GLASS, MOLDERS, POTTERY PLASTICS & ALLIED WORKERS INTERNATIONAL UNION, AFL—CIO, CLC, Defendant.**

No. 3–97–CV–2238 (WWE).

United States District Court,
D. Connecticut.

Feb. 22, 1999.

Michelle M. Duprey, New Haven, CT, for Kim Rennie.

Karl Fleischmann, Hartford, CT, Mimi C. Satter, Satter, Connor & Andrews, Syracuse, NY, Carl S. Yaller, Glass, Molders, Pottery, Plastics & Allied Workers Int'l, Union, Media, PA, for Glass, Molders, Pottery, Plastic & Allied Workers Intern. Union, AFL–CIO, CLC.

*RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

EGINTON, Senior District Judge.

In a four count complaint, plaintiff Kim Rennie seeks to hold defendant Glass, Molders, Pottery, Plastics and Allied Workers International Union ("International") liable for sexual harassment in violation the Connecticut Fair Employment Practices Act ("CFEPA"), retaliation in violation of CFEPA and the duty of fair representation pursuant to the National Labor Relations Act ("NLRA"), intentional infliction of emotional distress, and negligent infliction of emotional distress.

The defendant has moved for summary judgment as a matter of law as to all counts. Both parties have submitted statements of facts in compliance with Local Rule 9. Defendant has attached evidentiary materials. However, plaintiff has not submitted any supporting affidavits or other materials with her opposition to summary judgment. For the following reasons, defendant's motion will be GRANTED.

*Background*

International is a labor organization which represents workers in the United States and Canada. International's Local Union 31 was the collective bargaining representative for the production and maintenance employees at the Anchor Glass facility in Dayville.

Kim Rennie was an employee of Anchor Glass in Dayville, Connecticut, until the facility's closure in April 1997. While employed at Anchor Glass, Ms. Rennie was a member of International.

In the course of her employment, Ms. Rennie was injured several times. A herniation of her two discs in the cervical spine resulted in at least one prolonged absence, surgery and an extended period of light duty assignments.

After Ms. Rennie's doctor stated that she could not lift her arms above her waist or lift in excess of 10 pounds, Anchor Glass refused to provide her with further light duty assignments. Through International's Local Union 31, Ms. Rennie filed a grievance protesting Anchor's refusal to accommodate her disability. The grievance demanded Ms. Rennie's reinstatement and back pay.

Pursuant to the terms of the collective bargaining agreement with Anchor, International's Local 31 handled the first three

steps of Ms. Rennie's grievance. On or about February 21, 1996, Ms. Rennie's grievance was processed to step three of the grievance procedure. James Alleman, an International representative, was actively involved in processing her grievance at step three. He recommended that it proceed to the fourth step of the grievance procedure, which was handled by Frank Trojan, Mr. Alleman's superior. At step four, Mr. Trojan was charged with the discretion to decide whether Ms. Rennie's grievance should proceed to arbitration.

On April 24, 1996, Ms. Rennie attended a workers' compensation proceeding. At this meeting, an Anchor representative stated that Ms. Rennie could return to work at least on a part-time basis. When Anchor later reneged on this commitment, Ms. Rennie and Mr. Alleman met with Anchor representatives to enforce the promise to reinstate Ms. Rennie.

Immediately after this meeting, Ms. Rennie accepted Mr. Alleman's invitation to accompany him for a drink at The Paddock, a local bar. At The Paddock, Ms. Rennie and Mr. Alleman consumed cocktails and discussed the possibility of Ms. Rennie's reinstatement. Mr. Alleman then asked Ms. Rennie if she would "have any objection to going to bed" with him. Ms. Rennie answered that she did not so desire, and the two subsequently departed from the bar in separate vehicles. During this interaction, Mr. Alleman did not touch Ms. Rennie in an offensive manner, intimidate her, or insult her. Although Mr. Alleman had not requested that she keep silent about his behavior, Ms. Rennie did not inform anyone at International about the incident.

On May 15, 1996, International filed a second formal grievance seeking Ms. Rennie's reinstatement and protesting Anchor's refusal to abide by its prior promise to reinstate her. In June 1996, Anchor agreed to a partial resolution of Ms. Rennie's grievance. On July 2, 1996, Ms. Rennie returned to work at Anchor as a selector/packer.

On July 3, 1996, Mr. Alleman invited Ms. Rennie to meet him at Foxwoods Casino to join him for a drink and dinner. Ms. Rennie accepted his invitation and met him at a bar in the Foxwoods Casino. After some conversation about Ms. Rennie's return to work, her pending grievance for back pay, and Mr. Alleman's union organizing campaign, Mr. Alleman inquired whether Ms. Rennie preferred to gamble or go to bed with him first. Ms. Rennie responded that she preferred to gamble and then proceeded to the gambling floor.

At midnight, Mr. Alleman told Ms. Rennie that he was tired of gambling and would wait for her in his hotel room. As soon as Mr. Alleman left, Ms. Rennie went home.

On or about July 22, 1996, Mr. Trojan determined Ms. Rennie's return to work was a satisfactory resolution of her grievances and withdrew her grievances, thereby waiving her claim for back pay for approximately ten months salary. By deposition, Ms. Rennie stated that she was sure that Mr. Trojan had made that decision on his own.

*Discussion*

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the

moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## A. *Sexual Harassment*

In Counts One and Two, Ms. Rennie claims that International violated CFEPA, which prohibits sexual harassment. Ms. Rennie alleges that the facts of her case constitute both the quid pro quo and hostile environment forms of sexual harassment.

Federal precedent concerning employment discrimination is applicable to Connecticut's anti-discrimination statute. *See Levy v. Commission on Human Rights and Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996).

### 1. *Quid Pro Quo Harassment*

In a quid pro quo claim, the plaintiff must prove a direct nexus between the demand for sexual favors and an employment benefit or detriment. *Burlington v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). An employer is liable for the quid pro quo harassment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment. *Torres v. Pisano*, 116 F.3d (2d Cir.) *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

In the instant case, Mr. Alleman is not Ms. Rennie's supervisor, and International is not her employer. Ms. Rennie has not offered any authority indicating that a union member may hold her union liable for sexual harassment based on a union representative's conduct. However, even if she can assert a quid pro quo claim against International, Ms. Rennie still cannot prove quid pro quo harassment because Mr. Trojan rather than the Mr. Alleman, the alleged harasser, had control over Ms. Rennie's grievance when the alleged harassment took place.

Further, Ms. Rennie has provided no evidentiary support for her claim that Mr. Trojan's knowledge of Mr. Alleman's sexual harassment is an issue of fact in dispute. In fact, Ms. Rennie stated in her deposition that she was sure that Mr. Trojan acted alone in deciding to withdraw her grievances.

As Ms. Rennie has failed to establish a connection between Mr. Alleman's sexual advances and Mr. Trojan's withdrawal of her grievance, Ms. Rennie cannot satisfy the prima facie requirements for a quid pro quo claim.

### 2. *Hostile Environment Harassment*

In the context of sexual harassment, a hostile environment occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir.1989). A hostile work environment exists when the workplace is permeated with discriminatory intimidation and insult. *Torres v. Pisano*, 116 F.3d at 630–631. To prevail on a hostile environment case, the complaining employee must prove that the harassment is sufficiently severe or pervasive to alter the conditions of employment and to create an abusive working environment.

The alleged conduct must be sufficiently continuous and concerted to be deemed pervasive. It must be more than an isolated remark or occasional episode of harassment. *Tomka v. The Seiler Corp.*, 66 F.3d 1295, 1305, n. 5 (2d Cir.1995). For

example, in *Torres,* the plaintiff alleged that her supervisor harassed her so consistently that she lost count of the specific number of incidents.

■ In this instance, the alleged harassment is beyond the purview of a hostile environment claim. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Mr. Alleman made only two sexually-related statements to Ms. Rennie, both of which took place at a bar outside of the work environment. Mr. Alleman never touched Ms. Rennie in an offensive manner or threatened her physically or verbally. He never insulted her with vulgarities either at the time of or subsequent to the two incidents.

Although Ms. Rennie claims that Mr. Alleman invited her to Foxwoods for the purpose of discussing her grievances, she has not demonstrated that this issue is material to her hostile environment claim.

Ms. Rennie's willingness to join Mr. Alleman for dinner at Foxwoods indicates that she did not view Mr. Alleman as an offensive individual even after he had sexually propositioned her at The Paddock.

After the evening at Foxwoods, Mr. Alleman never made any kind of sexually-related comment to Ms. Rennie, and she only saw him once or twice at a union meeting, where he answered her questions, although in a short, irate manner.

The undisputed facts reveal that Mr. Alleman's alleged conduct did not interfere with the purpose of Ms. Rennie's workplace or create a workplace permeated with discriminatory insult and intimidation. Therefore, Ms. Rennie's hostile environment claim will fail as a matter of law.

B. *Breach of Duty of Fair Representation*

■ Count Two may also be construed as a claim for breach of International's duty of fair representation pursuant to the National Labor Relations Act ("NLRA"). A union breaches its implied duty of fair representation owed to its members only when its conduct is arbitrary, discriminatory or in bad faith. *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). According to the Second Circuit's two part test, the union's conduct must first have been arbitrary, discriminatory or in bad faith, and secondly, it must have seriously undermined the arbitral process. *Barr v. United Parcel Service,* 868 F.2d 36, 43 (2d Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989).

■ Although a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, an employee does not have an absolute right to have his or her grievance taken to arbitration. *Lapir v. Maimonides Medical Center,* 750 F.Supp. 1171, 1179 (E.D.N.Y. 1990). As long as the union has exercised its discretion in good faith, the court cannot intercede on behalf of an employee. *Barr,* 868 F.2d at 44. In other words, if the union made an informed decision that a grievance was not meritorious of arbitration, the employee has no right to have that grievance arbitrated.

■ To survive a motion for summary judgment on this issue, a plaintiff must set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty or arbitrary exercise of discretion. *Lapir,* 750 F.Supp. at 1177. Conclusory allegations without supporting facts demonstrating the union's lack of good faith fail to show a valid claim.

■ In the instant case, Ms. Rennie makes only the conclusory statement that International's decision must have been arbitrary, discriminatory and/or in bad faith because the withdrawal of her grievance for back pay cost her ten months of salary. Ms. Rennie submitted no affidavits or other evidentiary material to support an inference of an arbitrary, discriminatory or bad faith decision. At the same time, International submitted evidence indicating that Ms. Rennie could only perform light duty

assignments and considered herself to be totally disabled during the period relevant to her claim for back pay. Therefore, International has demonstrated that Mr. Trojan had a rational basis in deciding not to arbitrate Ms. Rennie's grievances for back pay.

Without any supportive evidence and no demonstration of disputed issues of genuine material facts, Ms. Rennie's breach of the duty of fair representation claim fails as a matter of law.

### C. Intentional and Negligent Infliction of Emotional Distress

In Counts Three and Four respectively, Ms. Rennie alleges that International is liable for intentional and negligent infliction of emotional distress.

It is unclear whether these tort claims are based on Mr. Alleman's conduct as well as the withdrawal of her grievances. In her opposition to summary judgment, Ms. Rennie asserts that the claims are "based on the complaint in its entirety," including the withdrawal of her grievances.

If based on the complaint in its entirety, these tort claims implicate the collective bargaining agreement and are thereby preempted by Section 301 of the NLRA. *International Brotherhood of Electrical Workers v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987). However, the Court will also consider the merits of these claims as if the alleged emotional distress derived from Mr. Alleman's conduct alone.

### 1. Intentional Infliction of Emotional Distress

 Liability for intentional infliction of emotional distress requires conduct exceeding all bounds of decent society and which is calculated to cause, and does cause, mental distress of a very serious kind. *DeLaurentis v. New Haven*, 220 Conn. 225, 266–67, 597 A.2d 807 (1991). In the instant case, Ms. Rennie has failed to allege conduct that could be reasonably

deemed to be extreme and outrageous. Mr. Alleman's two invitations to engage Ms. Rennie in a sexual relationship did not exceed all bounds usually tolerated by decent society. Mr. Alleman did not intimidate or touch Ms. Rennie offensively. After the rebuff at Foxwoods, he did not continue to pursue the matter.

Ms. Rennie claims that Mr. Alleman was aware of her health problems, and therefore, he knew her to be highly susceptible to damages from his conduct. However, Ms. Rennie has failed to provide evidence concerning the nature of these health problems and how they made her particularly susceptible to harm from Mr. Alleman's conduct. Therefore, her claim for intentional infliction of emotional distress will be dismissed.

### 2. Negligent Infliction of Emotional Distress

 To prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant knew or should have known that its conduct involved an unreasonable risk of causing emotional distress and that the distress if it was caused might result in illness or bodily harm. *Thomas v. Saint Francis Hospital And Medical Center*, 990 F.Supp. 81, 91 (D.Conn.1998), (*citing, Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978)). The distress experienced by the plaintiff must be reasonable in light of the defendant's conduct. *Barrett v. Danbury Hosp.*, 232 Conn. 242, 261, 654 A.2d 748 (1995). Inappropriate comments made with bad intent are not sufficient to impose liability for negligent infliction of emotional distress. *Thomas*, 990 F.Supp. at 92.

 In her opposition to summary judgment, Ms. Rennie failed to address the merits of her negligent infliction of emotional distress claim. Ms. Rennie has alleged in her complaint that she suffered emotional distress and humiliation as a result of Mr. Alleman's conduct. Howev-

er, as with her claim for intentional infliction of emotional distress, Ms. Rennie has submitted no evidence to demonstrate that Mr. Alleman's conduct foreseeably placed her at an unreasonable risk of illness or bodily harm. Her claim for negligent infliction of emotional distress will be dismissed.

### Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. No. 15] is GRANTED as to all counts of the complaint. The Clerk is directed to close this case.

SO ORDERED.